312 Ga. 379
FINAL COPY

S21A0811.  LOGAN v. THE STATE.

BOGGS, Presiding Justice.

Appellant Carl Garland Logan challenges his 2017 convictions for malice murder and possession of a knife during the commission of a crime in connection with the stabbing and beating death of Anthony Glenn Olivet. Appellant's sole enumeration of error is that the trial court violated his constitutional right to confront his accusers by preventing him from playing for the jury certain audio-recorded statements that a prosecution witness made to law enforcement officers to impeach the witness on cross-examination. However, the record does not support this claim. Accordingly, we affirm.[1]

---

[1] Olivet was killed sometime on the night of March 18 or early morning of March 19, 2012. On October 8, 2013, a Richmond County grand jury indicted Appellant for malice murder, felony murder, and possession of a knife during the commission of a crime. On August 21, 2017, at the outset of trial, Appellant waived his right to counsel, instead electing to represent himself. The trial

1.	The evidence presented at trial showed the following. Appellant is from Danville, Virginia. On February 26, 2012, he went to a house in Danville to exchange drugs for sex. When the woman he started to have sex with said that she could not continue, he got angry, retrieved a knife from the kitchen, and stabbed her in the

court directed attorney Kelly Williamson, Appellant's appointed counsel, to serve as Appellant's standby counsel throughout the trial. On August 24, the jury found Appellant guilty of all charges, and the court sentenced him to serve life in prison without the possibility of parole for malice murder and a consecutive term of five years for the knife possession charge; the felony murder count was vacated by operation of law. On September 7, Appellant filed a pro se motion for new trial. On September 20, Williamson filed both an entry of appearance as post-sentencing counsel for Appellant and another motion for new trial. On April 4, 2018, attorney Robert Beckwith filed a notice of substitution of counsel. On March 21, 2019, Beckwith filed an amended motion for new trial, and on April 2, Beckwith filed another amended motion for new trial. Appellant was incarcerated in Texas on unrelated charges, and the trial court held a hearing on the motion by videoconference. See Uniform Superior Court Rule 9.2 (A) (12) (authorizing superior courts to conduct "[p]ost-sentencing proceedings in criminal cases" by videoconference). On May 23, the court entered an order denying the new trial motion.

Beckwith filed a timely notice of appeal, and the case was initially docketed in this Court to the term beginning in December 2019. See Case No. S20A0389. However, Beckwith then filed a motion to remand the case to the trial court for a hearing on Appellant's request that Beckwith be removed as counsel and that Appellant be permitted to pursue his appeal pro se. On November 18, 2019, this Court entered an order granting the remand motion. On July 14, 2020, the trial court held a hearing by videoconference on Appellant's request to represent himself on appeal. On July 16, the court entered an order finding that Appellant had not waived his right to counsel on appeal and directing Beckwith to continue representing Appellant. Beckwith then filed a timely notice of appeal, and the case was re-docketed in this Court to the April 2021 term and submitted for a decision on the briefs.

2

back. He also threatened to kill the woman, and she fled. Appellant then attacked the woman's roommate with a steak knife, stabbing her twice in the abdomen before plunging the knife so hard into her temple that the handle broke off and the blade had to be surgically removed from her face.

Two weeks later, Appellant's brother told him that Appellant's name had come up in connection with the stabbings, and Appellant decided to flee to Augusta, Georgia, where his older cousin Alvin Coleman lived. Soon after Appellant arrived in Augusta, he went to a convenience store with Coleman and met Coleman's friend Olivet, who was panhandling outside. Olivet was known in the community as a peaceful and likeable person who was beset by both physical and mental disabilities. A local pastor and school superintendent, Joseph Boulineau, had previously helped Olivet get an apartment, and Appellant began staying there with Olivet.

On Sunday evening, March 18, Coleman took Olivet to get something to eat, and Olivet said that he was not getting along with Appellant, because Appellant was "trying to take over his

3

household" and overcharging him for cocaine. Appellant was still at Olivet's apartment when Coleman took Olivet home. Coleman was disturbed by his conversation with Olivet and discussed it with his wife, and later that same night, Coleman drove back to Olivet's apartment. On the way to Olivet's apartment, Coleman saw Appellant walking down the road in the opposite direction.

At Olivet's apartment, Coleman knocked on the door and the window, but there was no response. Coleman drove back the way he came, picked up Appellant, and asked him what had happened with Olivet. Appellant said that nothing had happened with Olivet but that he had decided to leave Augusta. Coleman thought that was a good idea and drove Appellant to the bus station downtown, where Appellant bought a ticket back to Danville using a fake name.

On Monday, March 19, Boulineau went to Olivet's apartment in the late morning to check on him and found Olivet lying dead on the floor underneath a quilt with an 11-inch kitchen knife sticking out of his throat. Boulineau immediately left the apartment, called 911, and waited for the authorities. In addition to the knife sticking

out of Olivet's throat, responding officers recovered a bloody wooden two-by-four lying on the floor near Olivet's body. Coleman drove up as officers were processing the scene. After interviewing Coleman and confirming aspects of his account, law enforcement officers identified Appellant as a possible suspect but were unable to locate him.

The medical examiner found multiple stab wounds to Olivet's neck and chest, as well as several injuries to the back of Olivet's head and neck that were consistent with his having been repeatedly bludgeoned with a two-by-four. A fingerprint in the blood on the two-by-four was later matched to Appellant.

When Appellant left Augusta, he made his way to Texas, where he was arrested within weeks on unrelated charges and imprisoned. Following Appellant's indictment in October 2013, a warrant was issued for Appellant's arrest, and Georgia initiated the process of extradition. In October 2015, Appellant sent a letter to the District Attorney's office stating that he "stab[bed] a man to death in Augusta." In February 2016, Appellant sent another letter to the

District Attorney's office, this time writing, "I am let[t]ing you know I . . . stab[b]ed to death Anthony Glenn Olivet."

2. Appellant's sole enumeration of error is that the trial court violated his constitutional right to confront his accusers by preventing him from impeaching Coleman on cross-examination with certain statements from Coleman's audio-recorded interviews with law enforcement officers that Appellant asserts were inconsistent with Coleman's trial testimony. Specifically, Appellant contends that the court prevented him from playing for the jury the following two statements that Coleman made, referring to Appellant: (1) "That's my cousin. . . . His dad's name is Carl Logan, from Virginia"; and (2) "He went in [a convenience store] and got something. He don't drink, he don't smoke or nothing, so he went in there and got him[self] something to eat."

On the first day of trial, Appellant informed the court that he wanted to represent himself instead of having his appointed counsel, Kelly Williamson, represent him. The court warned Appellant of the dangers of self-representation, including that if Appellant

represented himself, he would be "expected to follow all the rules of law, all the rules of criminal procedure, rules of evidence, [and] rules related to the presentation of evidence," even if Appellant did not know those rules. See *Faretta v. California*, 422 U. S. 806, 834 n.46 (95 SCt 2525, 45 LE2d 562) (1975) ("The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law."). At the end of an extensive colloquy, the court found that Appellant had made a knowing, intelligent, and voluntary waiver of his right to counsel and had instead chosen to represent himself at trial. The court then appointed Williamson to serve as standby counsel for Appellant, to which Appellant said that he had no objection. See id. ("Of course, a State may — even over objection by the accused — appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.").

7

During Appellant's cross-examination of Coleman, the following exchange occurred:

> Q. So when you was investigated by the investigator, you don't remember saying to the investigator that, "Carl Logan don't smoke or drink or do drugs?"
> A. No, sir, I don't quite remember. I don't remember saying that.
> Q. That's what you said. I'm just asking you do you remember.
> A. I said I don't remember.

The lead prosecutor interjected, "Your Honor, if he's going to impeach the witness, he needs to show some proof of it." The court told Appellant:

> If you want to present him with a copy of that statement that you're referencing, you can. But right now, I think this question has been asked and answered unless you want to go there and show him a copy of what he said, whatever you allege he said; okay?

Appellant replied, "It's on . . . the CD that the investigator had." The court asked if it was an "audio-recorded statement," and when Appellant said that it was, the court excused the jury.

The court asked Appellant if he was alleging that a recording existed of a statement that Coleman made to law enforcement

8

officers, and Appellant said, "Yeah." The court then asked Appellant if he was alleging that in that statement, Coleman said "that he had never seen you [i.e., Appellant] drink or smoke or use drugs; something like that?" Appellant replied, "Yes. He [i.e., Coleman] said he knows I didn't smoke or drink. He says that he knows I was his cousin. He says a lot of different things he's not saying now . . . ."

The court asked Williamson if she had a copy of the statements that Appellant was talking about. Williamson said that there were two disks of interviews of Coleman, which she handed up to the court at the court's request. The court asked Appellant which of the CDs contained the statements that he wanted to play for the jury or whether he wanted to play statements from both disks, and Appellant answered, "I don't know." The court asked Appellant if he knew which officer was conducting the interview or interviews in which Coleman made the statements, and Appellant replied, "No, I don't know which one it was." The court tried unsuccessfully to get assistance from the lead prosecutor, but he was not aware of the statements that Appellant referenced, although he could not say

9

that the statements did not exist. The court confirmed with Appellant that he recalled hearing the statements on the CDs. The court then said that it did not mind asking Williamson "as stand-by counsel and basically as an officer of the court" to make copies of the specific statements that Appellant wanted to play for the jury, but that the court did not know "where to start looking."

At that point, the discussion veered off onto other topics until the court brought it back to the CDs by asking Appellant, "So what is it that you are wanting off of these disks that you think is an inconsistent statement with what he [i.e., Coleman] testified to here today?" Appellant said, among other things, that Coleman told officers that he knew that Appellant was his cousin before Appellant came to Augusta. The court then called a brief recess.

When the recess ended, the court said to Appellant:

[Y]ou may recall that when you elected to proceed without counsel today, I told you that you were going to be held to the same standard as counsel would be held to. What I would hold your lawyer to, your — your stand-by lawyer who was preparing for your trial, was if she believed there was an inconsistent statement that she wanted to impeach a witness with, it would be expected of her that

she would know where that statement is, which disk, which witness, approximately what time. Those are the kind of things that lawyers do. I have no problem if you want to consult with her to see if she knows where it is, if it is. If you do not want to, that's 100 percent your choice, but you can ask him [i.e., Coleman], "Isn't it true you told the officer this and that," but at some point you have to accept his answer and not tell him in response, "Well, you told investigator whatever these words." At some point, you've got to accept his answer unless you're going to impeach him with extrinsic evidence, which means like playing a tape or confronting him with a statement that he made.

Appellant said, "That's my intentions because it's on those CDs," and the court replied, "Okay. Well, where? I mean I've asked you twice and you said you don't know which statement. You don't know which investigator, you don't know what time stamp, you don't know even approximately where in the statement it is." Appellant complained that he "only heard those disks one time" while he was "doing [his] work to prepare for trial."

The court told Appellant that he could consult with Williamson if he wanted to, but that otherwise the court was going to sustain the State's objection in the jury's presence. The court reiterated that for Appellant not to accept Coleman's answer to his question,

11

Appellant would "have to do something to impeach him," and in order to do that with the CDs, Appellant would have to "know at least which disk we need to talk about and . . . approximately where . . . the comment" is.

The court asked Appellant if he had consulted with Williamson on this issue and asked her where on the disks the statements he wanted to play were, and Appellant said that he had but did not get a response. The court said:

> All right. Well, I am going to return these [CDs] to . . . stand-by counsel. I will sustain the objection. If you want — again, if you wanted to ask anything of your stand-by counsel, I would allow it. But at some point, you're going to be held to the same standard as — as lawyers would be.

The court asked Appellant if he wanted to talk to Williamson to see if she knew where the statements were, and Appellant said to Williamson, "Do you know where it's at?" Appellant then conferred with Williamson, after which the court had the jury brought back into the courtroom.

The court announced to the jury, "I'm going to sustain that

objection made by the State." Appellant then asked Coleman several additional questions but did not attempt to introduce into evidence any part of Coleman's recorded interviews. After redirect examination by the State, Appellant again questioned Coleman. Again, he made no attempt to introduce any recorded statements to impeach Coleman's testimony. Notably, on direct examination, Coleman referred to Appellant as his "cousin" and as "part of my family," and on redirect examination, after noting that Appellant "made a big point about you saying that you never saw him do drugs around the time of the murder," the lead prosecutor asked Coleman directly if he saw Appellant do drugs around the time of the murder. Coleman answered, "No."

As the recitation above shows, it is not true that the trial court prevented Appellant from using Coleman's audio-recorded statements to law enforcement officers to impeach Coleman's trial testimony on cross-examination. To the contrary, the court patiently explained to Appellant more than once what he needed to do in order to properly introduce Coleman's prior statements so that Appellant

13

could play them for the jury. The court then encouraged Appellant to consult with his standby counsel, and after doing so, Appellant made no further attempt to introduce Coleman's prior statements for impeachment. Thus, the factual premise of Appellant's sole enumeration of error is contradicted by the record.

Moreover, the trial court did not abuse its discretion in requiring Appellant to follow the proper procedure to introduce Coleman's prior statements. See *Faretta*, 422 U. S. at 834 n.46. See also *Funes v. State*, 289 Ga. 793, 797-798 (716 SE2d 183) (2011) (finding no abuse of the trial court's broad discretion to determine the scope of cross-examination where the court admonished defense counsel that he was not using a prior statement properly and invited counsel to proceed by the rules but counsel then moved on to other questions); *Nicely v. State*, 291 Ga. 788, 796 (733 SE2d 715) (2012) (noting that trial courts have "'wide latitude . . . to impose reasonable limits on cross-examination'" about matters that are "'only marginally relevant'" (citation omitted)). Accordingly, this claim lacks merit.

*Judgment affirmed. All the Justices concur.*

Decided September 8, 2021.

Murder. Richmond Superior Court. Before Judge Padgett.

*Robert J. Beckwith*, for appellant.

*Jared T. Williams, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Parisia F. Sarfarazi, Assistant Attorney General*, for appellee.